## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOHN GOMILLA** | ) | **CIVIL ACTION** |
| | ) | **NO.:** 1:23cv179HSO-BWR |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **COMPLAINT** |
| | ) | |
| **HUEY P. STOCKSTILL, LLC** | ) | |
| | ) | |
| **Defendant** | ) | **JURY TRIAL DEMANDED** |
| | ) | |

### PLAINTIFF'S COMPLAINT FOR DAMAGES

NOW INTO COURT, through undersigned counsel, comes the Plaintiff, John Gomilla, and for his Complaint for Damages against the Defendant, Huey P. Stockstill, LLC ("Stockstill"), alleges, upon information and belief, and to the extent of his own knowledge as follows:

### PRELIMINARY STATEMENT

1.    This matter involves a serious automobile collision which almost took the life of Mr. Gomilla on the night of February 25, 2023, when the improved road he was driving on abruptly terminated directly into the Defendant's construction equipment. Had the Defendant taken even modest steps to comply with industry safety standards for marking, lighting, or establishing non-lethal barriers ahead of its construction equipment and before the termination of the improved road, the subject accident would never have occurred. This matter also presents an important

case of public safety, as the Defendant was utilizing state and federal funds and had more than adequate resources to provide minimal safety protections to the public. The Defendant's complete and utter failure to follow even minimal safety guidelines nearly cost Mr. Gomilla his life, has shortened his life expectancy, and will certainly dramatically increase his medical costs in the future – decreasing his quality of life in what should be his golden years. Mr. Gomilla was a cautious, vigilant, and coherent driver on the night in question with a history of safe driving practices – but even he was no match for the unlit, unmarked construction zone and equipment lurking in the darkness. The subject road was freshly paved and completely open for use. The beginning of the construction zone blended into the highway – there were no signs or obstacles to alert him. The subject road had no entrance barrier to passage – there were no barricades or other obstacles to stop any vehicle from turning left onto same from Lakeshore Road. The construction equipment parked in the middle of the service road was made invisible by the nighttime conditions. The construction equipment was left unshielded – there was no crash cushion or other means to protect him. The Defendant did nothing more than place a "ROAD CLOSED" sign on a metal pole <u>directly in front/to the right of</u> its construction equipment and <u>directly at the end of</u> the paved road. There was nothing done in advance to close the road or provide logical warnings such as plastic cones, flashing signs, a non-lethal barrier across the road ahead of the construction equipment, or any other simple and inexpensive method which would have logically stopped a driver from proceeding further. Instead, the road went from paved and improved to a dead-stop termination into heavy

construction equipment, and the Plaintiff, having zero warning in advance, collided directly into the equipment without warning and at such intensity that portions of the equipment nearly caused a decapitation. To be certain, this was a catastrophic accident that can be completely avoided in the future with simple and inexpensive protocols that already exist in the industry and which are widely recognized for their inexpensive and practical role in enhancing safety.

2.      The Plaintiff seeks damages for the injuries he sustained in the crash – a crash which the contractor had ample opportunity to prevent, or at least mitigate, at multiple intervals – for the bargain price of $25.00 – through means which the contractor had a legal duty to implement in order to protect the traveling public.

## **JURISDICTION**

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between a citizen of Louisiana and a citizen of Mississippi, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action which concerns a federal question.

## **VENUE**

5.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

6.    Plaintiff John Gomilla is an individual who resides in Hammond, Louisiana. Plaintiff is a citizen of Louisiana. Mr. Gomilla, a retired Airforce veteran, was 91 years old on the date of the accident.

7.    Upon information and belief, Defendant Huey P. Stockstill, LLC is a limited liability company formed under the laws of Mississippi which does business in Bay St. Louis, Mississippi. The Defendant's principal office address is listed as 130 Huey Stockstill Road, P.O. Box 758, Picayune, Mississippi 39466. The Defendant's Manager, Member, and President are listed as being Huey P. Stockstill Jr., and its Secretary is listed as Huey Stockstill III, both with an address of P.O. Box 758 Picayune, Mississippi 39466. Defendant's Registered Agent is listed as Huey Stockstill, with an address of 130 Huey Stockstill Road Picayune, Mississippi 39466.

## FACTS

### ROADWAY CONSTRUCTION IN GENERAL

8.    The Manual on Uniform Traffic Control Devices ("MUTCD") provides standards governing the implementation of Temporary Traffic Control Plans in roadway construction zones.[1] A "Temporary Traffic Control Plan" ("TTC Plan") describes temporary traffic control measures "to be used for facilitating road users through a work zone."[2]

---

[1] *See* MUTCD, *available at* https://mutcd.fhwa.dot.gov/kno_2009r1r2.htm (last visited July 11, 2023); *also available at* https://mutcd.fhwa.dot.gov/pdfs/2009r1r2/mutcd2009r1r2edition.pdf (last visited July 11, 2023). According to the U.S. Department of Transportation and Federal Highway Administration, the 2009 Edition is the most current version of the MUTCD. *See* https://highways.dot.gov/safety/other/older-road-user/engineering-guidance-and-training (last visited July 11, 2023).
[2] *See* MUTCD Section 6C.01.01.

9.      The MUTCD provides helpful definitions and explanations of the anatomy of roadway construction zones, a selection of which are included below:

a.      A "Temporary Traffic Control zone" ("TTC zone") is an area of a roadway where road user conditions are changed because of a "work zone" (i.e., an area with construction, maintenance, or utility work activities).[3] A typical TTC zone includes the advance warning area, transition area, activity area, and termination area.[4]

b.      The "advance warning area" is the portion of the roadway where road users are informed about the upcoming work zone.[5]

c.      The "activity area" is the portion of the roadway where the work activity takes place, and includes the work space, traffic space, and buffer space.[6]

d.      The "work space" is the portion of the roadway closed to road users and set aside for workers, equipment, and material.[7] Work spaces are usually delineated for road users by channelizing devices or, to exclude vehicles, by temporary barriers.[8]

e.      The "traffic space" is the portion of the roadway in which road users are routed through the activity area.[9]

---

[3] *See* MUTCD Sections 6C.02.01-02.
[4] *See* MUTCD Section 6C.03.01.
[5] *See* MUTCD Section 6C.04.01.
[6] *See* MUTCD Section 6C.06.01.
[7] *See* MUTCD Section 6C.06.02.
[8] *See* MUTCD Section 6C.06.02.
[9] *See* MUTCD Section 6C.06.05.

f.    The "buffer space" is a lateral and/or longitudinal area that separates road user flow from the work space or an unsafe area, and might provide some recovery space for an errant vehicle.[10] Neither work activity nor storage of equipment, vehicles, or material should occur within a buffer space.[11]

10.    The MUTCD also provides guidelines regarding the regulation and implementation of TTC zones, a selection of which are provided below:

a.    "Road user and worker safety and accessibility in TTC zones should be an integral and high priority element of every project from planning through design and construction."[12]

b.    "Motorists ... should be guided in a clear and positive manner while approaching and traversing TTC zones .... Adequate warning, delineation, and channelization should be provided to assist in guiding road users in advance of and through the TTC zone ... by using proper pavement marking, signing, or other devices that are effective under varying conditions."[13]

c.    "Channelization of road users should be accomplished by the use of pavement markings, signing, and crashworthy, detectable channelizing devices."[14]

---

[10] *See* MUTCD Section 6C.06.06.
[11] *See* MUTCD Section 6C.06.07.
[12] *See* MUTCD Section 6B.01.05.
[13] *See* MUTCD Section 6B.01.07(3)(A).
[14] *See* MUTCD Section 6B.01.07(5)(B).

    d.    "Crash records in TTC zones should be monitored to identify the need for changes in the TTC zone."[15]

    e.    "To accommodate run-off-the-road incidents, ... unencumbered roadside recovery areas or clear zones should be provided where practical."[16]

    f.    "Work equipment ... should be stored in such a manner to reduce the probability of being impacted by run-off-the-road vehicles."[17]

11.    The MUTCD also provides detailed explanations the "Traffic Control Devices" which should be provided for in TTC Plans and implemented in TTC Zones. "Traffic control devices" include signs, signals, markings, and other devices used to regulate, warn, or guide road users, placed on, over, or adjacent to a roadway.[18] According to the MUTCD, "[a]ll traffic control devices used for construction ... operations on a street, highway, or private road open to public travel ... shall comply with the applicable provisions of this Manual."[19] A selection of Traffic Control Devices will be discussed in more detail in the next section.

12.    In addition, the MUTCD advises that during "[l]ong-term stationary work," defined as work which occupies a location for more than three days, "there is ample time to install and realize benefits from the full range of TTC procedures and devices that are available for use."[20] "As a general rule, the closer the work is to road users ... the greater the number of TTC devices that are needed."[21] Further,

---

[15] *See* MUTCD Section 6B.01.07(4)(D).
[16] *See* MUTCD Section 6B.01.07(5)(A).
[17] *See* MUTCD Section 6B.01.07(5)(C).
[18] *See* MUTCD Section 6F.01.06.
[19] *See* MUTCD Section 6F.01.07.
[20] *See* MUTCD Section 6G.02.02(A); 6G.02.03.
[21] *See* MUTCD Section 6G.03.02.

"retroreflective and/or illuminated devices shall be used in long-term stationary TTC zones."[22]

THE CONSTRUCTION PROJECT

13.    The Defendant, Huey P. Stockstill, LLC ("Stockstill"), describes itself as "a leader in asphalt paving and construction services throughout South Mississippi and Louisiana," and states that its "mission is to implement long-term relationships with clients based on product quality, professional integrity, and safety."[23]

14.    The Defendant's website provides the following information:

The Stockstill family has been servicing south Mississippi and Louisiana for over 50 years. Huey Stockstill Sr. started the construction company in Picayune, Mississippi in the 1960s. At that time, Huey Sr. had only a handful of employees and one dump truck.

Over the past 5 decades, the company has grown to over 200 employees, 3 asphalt plants, 5 ready mix plants, 2 aggregate mining operations and a modernized fleet of equipment and trucks.

In 2015, Huey Stockstill Inc. joined the Dunn family of companies. This opportunity gave our company even more financial resources and dedicated knowledge needed to continue growing and improving the quality of our service. We renamed the company Huey P. Stockstill, LLC in memory of our founder. Today, the company is owned by Huey Stockstill Jr. and it is operated by him and his son Huey Stockstill III.

A lot has changed over the years, but what hasn't changed is how we run our business. Huey Sr. built the company on the foundation of doing the right thing. He instilled in us the importance of integrity, honesty, and hard work. That's why our HPS motto is "Where a handshake still has meaning."[24]

---

[22] *See* MUTCD Section 6G.02.04.
[23] *See* https://www.hueystockstill.com/ (last visited July 11, 2023).
[24] *See* https://www.hueystockstill.com/ (last visited July 11, 2023).

15.    The Defendant's website also states that "SAFETY IS OUR #1 PRIORITY" and that the company has a "COMMITMENT TO SAFETY."[25]

16.    During February of 2023, the Defendant was working under a contract it entered into with the Mississippi Department of Transportation ("MDOT") to carry out Federal Aid Project No. NHPP-0003-01(206)/108684301, a roadway construction project in Hancock County ("the Project").

17.    The main object of the Project was to "[o]verlay approximately 5 miles of US 90 from Rifle Range Road to Lower Bay Road in Hancock County."[26] This included "widening of crossovers, milling of asphalt and concrete pavement, removal of concrete pavement punchouts, removal of excess material, asphalt leveling and surface overlay, sawing and sealing of transverse joints, placing shoulder material, application of striping and raised pavement markers, rumble strips, replacement of delineators, and object markers."[27]

18.    The Project was listed by MDOT for an August 23, 2022 letting,[28] and the Defendant was one of two companies to bid on the project.[29] The Defendant's bid for $6,040,553.00 included $250,000 for "Maintenance of Traffic."[30]

---

[25] *See* https://www.hueystockstill.com/safety (last visited July 11, 2023).

[26] *See* Project Documents, Section 901, page 3; *see also* Section 904, page 80 ("Maintenance Map").

[27] *See* Project Documents, Section 904, page 76.

[28] *See* https://mdot.ms.gov/Applications/BidSystem/lettingInfo.aspx?r=0&date=August%2023,%202022 (last visited July 11, 2023).

[29] *See* https://mdot.ms.gov/Applications/BidSystem/BiddersList.aspx?p=108684301000&ld=20220823 (last visited July 11, 2023).

[30] *See* https://mdot.ms.gov/bidsystem_data/20220823/TABULATIONS/108684301.pdf (last visited July 11, 2023).

*The Project Documents*

19.    MDOT provided "Proposal and Contract Documents" for the Project (the "Project Documents").[31]

20.    Roadway construction projects funded by Federal-aid are subject to the provisions of Title 23, Section 655, Subpart F of the Code of Federal Regulations, which "prescribe[s] the policies and procedures of the Federal Highway Administration ("FHWA") to obtain basic uniformity of traffic control devices on all streets and highways in accordance with ... references approved by the FHWA for application on Federal-aid projects."[32]

21.    The Project Documents also incorporated form FHWA-1273, which contains "required contract provisions" for "federal-aid construction projects."[33] Section VII(1) of form FHWA-1273, which "is applicable to all Federal-aid construction contracts and to all related subcontracts," provides the following:

> In the performance of this contract the contractor shall comply with all applicable Federal, State, and local laws governing safety, health, and sanitation (23 CFR Part 635). The contractor shall provide all safeguards, safety devices and protective equipment and take any other needed actions as it determines, or as the contracting officer may determine, to be reasonably necessary to protect the life and health of employees on the job and the safety of the public and to protect property in connection with the performance of the work covered by the contract. 23 CFR 635.108.[34]

---

[31] *See* Project Documents, *available at*
https://mdot.ms.gov/bidsystem_data/20220823/PROPOSALS/108684301.pdf (last visited July 11, 2023).
[32] *See* 23 CFR 655.601.
[33] *See* Project Documents, page 98.
[34] *See* Project Documents, page 105.

22.     Section 905 of the Project Documents provides a sample proposal for the

Project which, in part, states the following:

> The Specifications are the current Standard Specifications of the Mississippi Department of Transportation approved by the Federal Highway Administration, except where superseded or amended by the plans, Special Provisions and Notice(s) to Bidders attached hereto and made a part thereof.
>
> I (We) certify that I (we) possess a copy of said Standard and any Supplemental Specifications.
>
> [...] I (We) certify that I (we) have carefully examined the Plans, the Specifications, including the Special Provisions and Notice(s) to Bidders, herein, and have personally examined the site of the work.
>
> On the basis of the Specifications, Special Provisions, Notice(s) to Bidders, and Plans, I (we) propose to furnish all necessary machinery, tools, apparatus and other means of construction and do all the work and furnish all the materials in the manner specified.[35]

23.     Section 902 of the Project Documents provides a sample contract for the

Project which, in part, states the following:

> This contract entered into by and between the Mississippi Transportation Commission on one hand, and the undersigned contractor, on the other witnesseth:
>
> That, in consideration of the payment by the Mississippi Transportation Commission of the prices set out in the proposal hereto attached, [...] the undersigned contractor hereby agrees to accept the prices stated in the proposal in full compensation for the furnishing of all materials and equipment and the executing of all the work contemplated in this contract.
>
> It is understood and agreed that the advertising according to law, the Advertisement, the instructions to bidders, the proposal for the contract, the specifications, the revisions of the specifications, the special provisions, and also the plans for the work herein contemplated [...] shall be held to be, and are hereby made a part of this contract by specific

---

[35] *See* Project Documents, Section 905.

reference thereto and with like effect as if each and all of said instruments had been set out fully herein in words and figures.

It is further agreed that for the same consideration the undersigned contractor shall be responsible for [...] faithfully completing the whole work in good and workmanlike manner according to the approved Plans, Specifications, Special Provisions, Notice(s) to Bidders, and requirements of the Mississippi Department of Transportation [...][36]

24.    Special Provision No. 907-618-4 of the Project Documents includes "Additional Signing Requirements," providing that "For compliance with the traffic control plan, the Contractor will be required to install and maintain traffic control devices at various locations throughout the project. Payment for these devices will be included in the price bid for pay item no. 618-A, Maintenance of Traffic per lump sum."[37]

25.    Section 904 of the Project Documents also provides standard drawings which "shall govern appropriate items of required work."[38] A selection of these figures are included below.

    a.    A standard drawing for "Sign and Barricade Details" includes figures of drums, markers, barricades, and other channelizing devices to be used during construction projects, including a "Road Closed" sign mounted on a Type 3 barricade.[39]



---

[36] *See* Project Documents, Section 902.
[37] *See* Project Documents, Special Provision No. 907-618-4, page 119.
[38] *See* Project Documents, Section 904, page 39.
[39] *See* Project Documents, Section 904, page 60.

b.    A standard drawing for "Temporary Striping" includes figures of striping and raised pavement markers to be used during construction projects on 2-lane and 4-lane divided highways.[40]



c.    A standard drawing for "Drum Placement" includes figures of drums used to close the shoulder.[41]



---

[40] *See* Project Documents, Section 904, page 65.
[41] *See* Project Documents, Section 904, page 68.

26.    Supplement to Special Provision No. 907-618-4 of the Project Documents includes the following requirements:

a.    Placement of Type 3 Barricades, and requiring "Ahead" signs to be placed "at each local road or street entering the project."[42]



b.    Placement of certain traffic control signs in the construction area, including W20 "Ahead" signs.[43]



---

[42] *See* Project Documents, page 117.
[43] *See* Project Documents, page 118.

### *The MSSRBC*

27.    The Mississippi Standard Specifications for Road and Bridge Construction ("MSSRBC") are construction standards which have been approved and adopted by the Mississippi Transportation Commission.[44]

28.    Section 904 of the Project Documents provides that the "current (2017) Edition of the ["MSSRBC"] adopted by the Mississippi Transportation Commission is made a part hereof fully and completely as if it were attached hereto."[45]

29.    The MSSRBC provides that "all of the provisions and requirements of Division 100 shall be applicable to all contracts," including Subsections 104 and 107.

30.    Subsection 104 includes the following provisions:

a.    104.01: "The Contractor shall furnish all labor, materials, equipment, supplies, transportation, supervision, methods and procedures necessary to complete the work in accordance with the plans, specifications and terms of the Contract."[46]

b.    104.04: "The Contractor must maintain all traffic control features over the section of road under construction in accordance with the plans, MUTCD, and Section 618 of these specifications."[47]

---

[44] *See* The MSSRBC, *available at*
https://mdot.ms.gov/documents/Construction/Specifications/2017%20Standard%20Specifications.pdf
(last visited July 11, 2023).
[45] *See* Project Documents, Section 904, page 5.
[46] *See* MSSRBC Section 104, page 21.
[47] *See* MSSRBC Section 104, page 26.

c.     104.04: "The Contractor shall be bound by the provisions of this subsection and other applicable provisions of these specifications and the Contract with regard to the safe and convenient passage of traffic."[48]

d.     104.04: "In the case of a project for improvements or construction alongside and existing roadway on which traffic is required to be maintained, no equipment, vehicles, or materials will be permitted to park or be stored within the clear/safety zone of the roadway unless it is behind a lane or shoulder closure."[49]

31.    Subsection 107 includes the following provisions:

a.     107.10: "The Contractor shall provide, erect and maintain all necessary barricades, lights, danger signals, signs and other traffic control devices, ... and shall take all necessary precautions for the protection of the work and the safety of the public."[50]

b.     107.10: "Highways or parts of the work closed to through traffic shall be protected by effective barricades."[51]

c.     107.10: "Suitable warning signs shall be provided to properly control and direct traffic."[52]

d.     107.10: "The Contractor shall erect warning signs in advance of all places on the project where operations may interfere with traffic and at all

---

[48] *See* MSSRBC Section 104, page 27.
[49] *See* MSSRBC Section 104, page 27.
[50] *See* MSSRBC Section 107.10, page 54.
[51] *See* MSSRBC Section 107.10, page 54.
[52] *See* MSSRBC Section 107.10, page 54.

intermediate points where the work crosses or coincides with the existing roadway."[53]

    e.    <u>107.10:</u> "All barricades, warning signs, lights, temporary signals, other protective devices, flaggers and signaling devices shall meet or exceed the minimum requirements contained in the MUTCD."[54]

32.    Section 618 of the MSSRBC, incorporated by Section 104.04, outlines the "Maintenance of Traffic and Traffic Control Plan."[55] The Traffic Control Plan includes MSSRBC Sections 618 and 619; MSSRBC Subsections 104.4, 105.15, 107.07, and 107.10; special provisions modifying Section 618 and supplements thereto; individual plan sheets applicable to the plan; and Part VI of the MUTCD.[56]

33.    Section 618 of the MSSRBC includes the following provisions:

    a.    <u>618.01.1-2:</u> "This work includes furnishing, erecting, maintaining in good condition, and removing all required construction signs, barricades, and temporary traffic stripe,"[57] and "consists of complying with the contract requirements of the Department's Traffic Control Plan."[58]

    b.    <u>618.01.2:</u> "The Contractor shall designate a Traffic Control Supervisor (TCS) who will be responsible for monitoring and maintaining the effectiveness of the plan."[59] "At a minimum, the TCS shall have the following duties: (a) Ensure that all traffic control devices are in compliance with the

---

[53] *See* MSSRBC Section 107.10, page 54-55.
[54] *See* MSSRBC Section 107.10, page 55.
[55] *See* MSSRBC Section 618, page 439.
[56] *See* MSSRBC Section 618.01.2, page 439-440.
[57] *See* MSSRBC Section 618.01.1, page 439.
[58] *See* MSSRBC Section 618.01.2, page 439.
[59] *See* MSSRBC Section 618.01.2, page 440.

plans, specifications and the latest edition of the MUTCD; (b) Correct all traffic control safety hazards immediately after discovery; (c) Monitor the work to ensure that no potential hazards exist due to the Contractor's operations; (d) Monitor and evaluate both the daytime and nighttime performance of all traffic control devices installed on the project, and take corrective actions on all deficiencies and note such actions on the inspection form; [...] (g) Perform daily daytime inspections and weekly nighttime inspections on projects with predominately daytime work [...]; (h) Document the results of the inspections on the form(s) provided by the Department [which] shall be submitted to the Engineer on a weekly basis."[60]

  c. <u>618.03.2:</u> "The Contractor shall construct, erect, maintain, clean, repair and replace as necessary all barricades, warning signs and other traffic control devices specified or ordered."[61] "Such signs and all other signs and devices of a temporary nature shall be in accordance with Section 619, the plans, and the MUTCD, as applicable."[62]

34. Section 619 of the MSSRBC, "Traffic Control for Construction Zones," includes the following provisions:

  a. <u>619.01:</u> "This work consists of furnishing, placing, maintaining or replacing as necessary, removing when no longer applicable and installation at other locations all traffic control devices including pavement marking

---

[60] *See* MSSRBC Section 618.01.2, page 440-441.
[61] *See* MSSRBC Section 618.03.2, page 444.
[62] *See* MSSRBC Section 618.03.2, page 444.

materials (paint, tape, markers, etc.) in accordance with the contract provisions."[63]

    b.   <u>619.02.7:</u> "Channelization devices, vertical panels, tubular markers, cones, drums, barricades and temporary raised islands shall meet the requirements of the plans and Sections 6F.63 through 6F.75 of the MUTCD."[64]

### *The MUTCD*

35.    The MUTCD is approved by the Federal Highway Administration ("FHWA") and is "recognized as the national standard for traffic control on all public roads."[65]

36.    The provisions and guidelines of the MUTCD are incorporated into the Project Documents through the MSSRBC's Traffic Control Plan and related provisions.[66] The MUTCD is also incorporated into the Code of Federal Regulations by reference.[67]

37.    The MUTCD provides for the following Traffic Control Devices in Chapter 6F:

    a.   <u>"ROAD WORK" Sign:</u> This sign is a type of "advance warning sign" which "should be placed in advance of the TTC zone at varying distances depending on roadway type, condition, and posted speed."[68] This sign "serves as a general warning of obstructions or restrictions, [and] should be located in

---

[63] *See* MSSRBC Section 619.01, page 450.
[64] *See* MSSRBC Section 619.02.7, page 452.
[65] *See* 23 CFR 630.1002, n.1.
[66] *See generally* MSSRBC.
[67] *See* 23 CFR 630.1002, n.1 (the MUTCD "is incorporated by reference into the Code of Federal Regulations at 23 CFR part 655").
[68] *See* MUTCD Section 6F.17.01.

advance of the work space or any detour on the road where the work is taking place."[69] In addition, "[v]arious conditions, such as limited sight distance or obstructions that might require a driver to reduce speed or stop, might require additional advance warning signs."[70] Further, "[w]here traffic can enter a TTC zone from a crossroad or a major (high-volume) driveway, an advance warning sign should be used on the crossroad or major driveway."[71]



*See* MUTCD Figure 6F-4.

      b.   <u>"ROAD CLOSED" Sign:</u> This sign "should be used when the roadway is closed to all road users except contractors' equipment or officially authorized vehicles" and "should be accompanied by appropriate warning and detour signing."[72] In addition, this sign "should be installed at or near the center of the roadway on or above a Type 3 Barricade that closes the roadway."[73]



*See* MUTCD Figure 6F-3.

---

[69] *See* MUTCD Section 6F.18.01.
[70] *See* MUTCD Section 6F.17.03.
[71] *See* MUTCD Section 6F.18.02.
[72] *See* MUTCD Section 6F.08.01; Figure 6F-3, Sign R11-2.
[73] *See* MUTCD Section 6F.08.03.

      c.    <u>Barricade:</u> This is a type of channelizing device which may be fixed or portable, and has "from one to three rails with appropriate markings and is used to control road users by closing, restricting, or delineating all or a portion of the right-of-way."[74] Specifically, <u>Type 3 Barricades</u> "should be used to close or partially close a road," and "may be placed completely across a roadway or from curb to curb.[75] In addition, "[w]here provision is made for access of authorized equipment and vehicles, the responsibility for Type 3 Barricades should be assigned to a person who will provide proper closure at the end of each work day."[76]



*See* MUTCD Figure 6F-7.

      d.    <u>Temporary Traffic Barriers:</u> This device, which may be portable or movable, "is designed to help prevent penetration by vehicles while minimizing injuries to vehicle occupants."[77] One of the "primary functions" of temporary traffic barriers is "[t]o keep vehicular traffic from entering work areas."[78]

---

[74] *See* MUTCD Section 6F.68.01.
[75] *See* MUTCD Sections 6F.68.18-19.
[76] *See* MUTCD Section 6F.68.20.
[77] *See* MUTCD Section 6F.85.01.
[78] *See* MUTCD Section 6F.85.02.

e.    <u>Cones:</u> This is a type of channelizing device used to channelize road users which "can be struck without causing damage to the impacting vehicle."[79] Cones used at night should be at least 28 inches tall and retro-reflectorized or equipped with lighting devices.[80]



*See* MUTCD Figure 6F-7.

f.    <u>Tubular Markers:</u> This is a type of channelizing device used to channelize road users which is attached to the pavement and "can be struck without causing damage to the impacting vehicle."[81] Tubular markers used at night should be at least 28 inches tall and retro-reflectorized or equipped with lighting devices.[82] Because they "have less visible area than other devices," they should only be used "where space restrictions do not allow for the use of other more visible devices."[83]



---

[79] *See* MUTCD Section 6F.64.01; 6F.64.04.
[80] *See* MUTCD Section 6F.64.01-02.
[81] *See* MUTCD Section 6F.65.01; 6F.65.06.07.
[82] *See* MUTCD Section 6F.65.02-03.
[83] *See* MUTCD Section 6F.65.04.

*See* MUTCD Figure 6F-7.

g.   <u>Vertical Panels:</u> This is a type of channelizing device which may be used to channelize vehicular traffic or replace barricades where space is limited.[84]



**VERTICAL PANEL**

*See* MUTCD, Figure 6F-7.

h.   <u>Drums:</u> This is a type of channelizing device which is most commonly used in a group to channelize road users.[85] Drums are "highly visible, have good target value, give the appearance of being formidable obstacles and, therefore, command the respect of road users."[86]



**DRUM**

*See* MUTCD, Figure 6F-7.

---

[84] *See* MUTCD Section 6F.66.01; 6F.66.04.
[85] *See* MUTCD Section 6F.67.03.
[86] *See* MUTCD Section 6F.67.02.

i.    "Direction Indicator" Barricade: This is a type of channelizing device which may be used in "tapers, transitions, and other areas where specific directional guidance to drivers is necessary."[87] They "should be used in series to direct the driver through the transition and into the intended travel lane."[88]



DIRECTION INDICATOR BARRICADE

*See* MUTCD, Figure 6F-7.

j.    Temporary Markings: These are "pavement markings or devices that are placed within TTC zones to provide road users with a clearly defined path of travel ... when the permanent markings are either removed or obliterated during work activities."[89] "Warning signs, channelizing devices, and delineation shall be used to indicate required road user paths in TTC zones where it is not possible to provide a clear path by pavement markings."[90] "All pavement markings and devices used to delineate road user paths should be reviewed during daytime and nighttime periods."[91]

---

[87] *See* MUTCD Section 6F.69.03.
[88] *See* MUTCD Section 6F.69.04.
[89] *See* MUTCD Section 6F.78.01.
[90] *See* MUTCD Section 6F.78.04.
[91] *See* MUTCD Section 6F.78.06.

k.    <u>Temporary Raised Pavement Markers:</u> These are retroreflective or internally illuminated raised pavement markers used to substitute for broken line segments.[92]

l.    <u>Lighting Devices:</u> These devices "may be used to supplement retroreflectorized signs, barriers, and channelizing devices."[93]

m.    <u>Warning Lights:</u> These lights are portable, powered, yellow, lens-directed, enclosed lights which may be mounted on signs or channelizing devices in either a steady-burn or flashing mode.[94] Warning lights are light weight, portable, and "useful" supplements to retroreflectorization, and "the flashing lights are effective in attracting road users' attention.[95] Type A Low-Intensity Flashing warning lights "are used to warn road users during nighttime hours that they are approaching or proceeding in a potentially hazardous area."[96] Type B High-Intensity Flashing warning lights "are used to warn road users during both daylight and nighttime hours that they are approaching a potentially hazardous area."[97]

n.    <u>Crash Cushions:</u> This device is designed to "mitigate the effects of errant vehicles that strike obstacles, either by smoothly decelerating the vehicle to a stop when hit head-on, or by redirecting the errant vehicle."[98]

---

[92] *See* MUTCD Section 6F.79.01; 6F.79.05.
[93] *See* MUTCD Section 6F.81.03.
[94] *See* MUTCD Section 6F.83.01; 6F.83.03; 6F.83.06.
[95] *See* MUTCD Section 6F.83.05.
[96] *See* MUTCD Section 6F.83.12.
[97] *See* MUTCD Section 6F.83.14.
[98] *See* MUTCD Section 6F.86.01.

Crash cushions "help protect drivers from the exposed ends of barriers, fixed objects, shadow vehicles, and other obstacles."[99]

THE ACCIDENT

38.    In February of 2023, Mr. Gomilla was a relatively healthy and spry 91-year-old retired veteran. He lived alone without assistance, drove his car without assistance, and ambulated without assistance. He kept an active social calendar and was active in his community.

39.    On February 25, 2023, Mr. Gomilla woke up around 7:00 a.m., took his morning medication as usual, and drove to Chick-fil-A to meet friends for breakfast. Mr. Gomilla has followed a similar routine every day for many years. He held a valid and current Louisiana driver's license No: 006733437.

40.    That day, Mr. Gomilla also had plans to visit a few casinos with his longtime friend, Clarity Tuttle, in Bay St. Louis, Mississippi.

41.    After finishing his morning routine, Mr. Gomilla prepared to go pick up Ms. Tuttle in his 2020 Nissan Murano automobile.

42.    After picking up Ms. Tuttle around 10:00 a.m., Mr. Gomilla drove the pair to the Hollywood Casino in Bay St. Louis, Mississippi.

43.    A few hours later, Mr. Gomilla drove Ms. Tuttle to the Silver Slipper Casino in Waveland, Mississippi.

44.    Around 7:00 p.m., Mr. Gomilla and Ms. Tuttle attended their dinner reservation at the Blue Bayou restaurant in the Silver Slipper. Around 9:00 p.m.,

---

[99] *See* MUTCD Section 6F.86.01.

upon finishing dinner, they got into Mr. Gomilla's vehicle and began their drive back home to Hammond, Louisiana.

45.    Mr. Gomilla, who was driving his car that evening, was wearing his seatbelt, held a valid license, was not intoxicated, and did not have any visual impairments inhibiting his ability to drive at night. He also had a clean driving record and had never been in an automobile accident before.

46.    Ms. Tuttle, in the front passenger seat of Mr. Gomilla's car, was also wearing her seatbelt.

47.    When Mr. Gomilla left the Silver Slipper, it was dark outside, and the weather was a little foggy.

48.    As Mr. Gomilla was driving North on Lakeshore Road, he came upon a section of freshly paved road on Highway 90, in Hancock County.[100]

49.    Both sides of Highway 90 and an adjoining service road were freshly paved. Mr. Gomilla did not see any lights, signs, barricades, cones, or other markings to indicate that an area of the road was under construction.

50.    Mr. Gomilla intended to turn onto Highway 90 to head home. However, due to the lack of lights, signs, barricades, cones, or other markings, as well as the lack of roadway markings on the fresh asphalt, Mr. Gomilla mistakenly turned onto the freshly paved service road.

51.    There was no barrier, sign, or other marking in place to prevent or deter vehicles from turning onto the service road while crossing Highway 90.

---

[100] According to the Police Report, the exact location of the accident was Latitude: 30.300896*N Longitude: 89.470289*W.

52.     Not long after Mr. Gomilla turned onto the service road, around 9:23 p.m., he collided with a Caterham back hoe parked in the middle of the road head-on.[101]

53.     Mr. Gomilla had a visual on the machinery about the same time that he hit it; it was almost instantaneous.

54.     Mr. Gomilla did not see any barriers, signs, cones, lights, or other traffic control devices to alert him to the presence of the roadway construction zone, and none were present.

55.     Mr. Gomilla did not see any barriers, signs, cones, lights, or other traffic control devices placed in the middle of the service road to prevent or deter vehicles from driving down it and none were present.

56.     Mr. Gomilla did not see any barriers, signs, cones, lights, or other traffic control devices to alert vehicles to the presence of construction machinery parked in the middle of the road and none were present.

57.     Mr. Gomilla was knocked unconscious when his vehicle collided with the equipment, and with such force that his hearing aids popped out, his airbags deployed, and his car was totaled.

58.     Ms. Tuttle's Apple Watch called 911 upon impact.

59.     Around 9:34 p.m., the Hancock County Sheriff's Department arrived to the accident scene.

---

[101] *See* Police Report, page 8, 13 (stating that the Caterham was "parked approximately 50 yards off the roadway).

60.     Shortly thereafter, Mr. Gomilla was transported to Memorial Hospital of Gulfport by ambulance.

61.     The Police Report confirmed that Mr. Gomilla was wearing his seatbelt at the time of the accident.[102] The responding Officer observed that Mr. Gomilla's condition was apparently normal, that he was not distracted, and that the crash was not related to speeding.[103] Alcohol use was not suspected, and Mr. Gomilla was not tested.[104]

62.     The Police Report confirms that no barriers were present on the service road.[105]

63.     Photographs of the crash site taken shortly after the accident revealed that (a) no barricades, drums, or other traffic control devices were present in the roadway where the side of the highway and service road met; (b) no barricades, drums, or other adequate traffic control devices were present where the service road became "closed" to traffic; (c) the "road closed" sign was not placed on a barricade; (d) no temporary traffic stripes or markers were placed on the edge of the freshly paved roadway.

---

[102] *See* Police Report, page 6.
[103] *See* Police Report, page 7.
[104] *See* Police Report, page 7.
[105] *See* Police Report, page 4, 7, 13.




64.    Mr. Gomilla did not regain consciousness until he woke up in the hospital, where he remained until March 1, 2023. He sustained serious injuries in the accident, including a concussion, lacerations, severe bruising to his face and other parts of his body, injuries and swelling in his left leg, as well as other injuries.

65.    Since returning to his home in Hammond, Louisiana from the hospital, Mr. Gomilla has been receiving home health care and physical therapy. He has also needed to visit the emergency room due to swelling in his left leg, and still suffers from windshield glass particles embedded in his forehead.

66.    Mr. Gomilla's injuries have greatly impacted him since the accident. He has suffered from a generally weakened condition, where before he was energetic. He has been unable to stand for long periods due to the pain and swelling in his left leg,

where before he was active. He has been forced to use a walker for the first time in his life, where before he could walk and stand without support or assistance. He has lost weight and his appetite has greatly diminished, where before he was a healthy weight and enjoyed a full breakfast each morning. He has suffered lingering effects from the concussion, where before he was spry. He has suffered lingering effects from the swelling and bruising, where before he was pain-free. In short, Mr. Gomilla's quality of life has decreased due to injuries, pain, and loss of autonomy.

67.     The injuries Mr. Gomilla sustained as a result of this accident will cause him significantly increased medical costs in the future and are likely to result in diminished quality of life and shortened life expectancy. Mr. Gomilla was fully self-sufficient before the accident and is likely to incur significant life care expenses due to his limited mobility and the earlier onset of disabling degenerative conditions that will result from the trauma sustained in the impact, as well as the more rapid onset of neurologic and cognitive decline – all of which will significantly decrease his quality and enjoyment of life and significantly increase the financial cost of healthcare and life care services.

## CAUSES OF ACTION

### COUNT ONE

68.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 66 as though fully set forth herein.

69.    The Defendant, as the contractor of a roadway under construction, had a duty under Mississippi Law to give legally sufficient notice to and/or warn drivers that the roadway was under construction.

70.    The Defendant failed to give warning and/or notice sufficient such that drivers, including the Plaintiff, would or should know that the roadway was under construction; failed to warn drivers, including the Plaintiff, of a dangerous condition; and failed to provide adequate safeguards, safety devices, and/or protective equipment which would have prevented and/or mitigated automobile accidents such as the Plaintiff's.

71.    The Defendant's breach of its duty includes, but is not limited to, the following:

a.    Failing to implement proper and/or sufficient traffic control devices in the construction/work zone.

b.    Failing to sufficiently mark the construction/work zone with signs, channelizing devices, barriers, and/or pavement markings.

c.    Failing to place proper and/or sufficient road work signs in advance of the construction/work zone.

d.    Failing to implement a sufficient advance warning area in advance of the construction/work zone.

e.    Failing to provide proper and/or sufficient advance warning signs in advance of the construction/work zone.

f.      Failing to sufficiently close and/or mark the construction/work zone via channelizing devices, temporary barriers, or other means.

g.      Failing to provide proper and/or sufficient warning, delineation, and/or channelization through pavement markings, signs, or other crashworthy devices.

h.      Failing to implement proper and/or sufficient traffic control devices, including signs, signals, markings, and other devices.

i.      Failing to provide proper and/or sufficient retroreflective and/or illuminated devices.

j.      Failing to place proper and/or sufficient road work signs at the crossroad of Highway 90 and the service road/construction zone.

k.      Failing to place proper and/or sufficient barriers, cones, barrels, or other traffic control devices at the crossroad of Highway 90 and the service road/construction zone.

l.      Failing to place proper and/or sufficient temporary traffic barriers to close the roadway to traffic.

m.      Failing to place a proper and/or sufficient road closed sign accompanied by appropriate warning signing.

n.      Failing to place a proper and/or sufficient road closed sign at or near the center of the roadway.

o.      Failing to place a proper and/or sufficient road closed sign on a barricade closing or partially closing the roadway.

p.  Failing to place a proper and/or sufficient Type 3 barricade to close the roadway.

q.  Failing to provide proper and/or sufficient closure of the roadway at the end of the work day.

r.  Failing to provide a proper and/or sufficient roadside recovery area accommodate run-off-the road incidents.

s.  Failing to provide a proper and/or sufficient buffer space to protect errant vehicles by storing construction equipment within the buffer space.

t.  Failing to properly store construction equipment in such a manner to reduce the probability of being impacted by run-off-the-road vehicles."

u.  Failing to place proper and/or sufficient crash cushions, barricades, drums, or other traffic control devices in front of the construction equipment.

v.  Failing to place proper and/or sufficient lights or other retroreflective traffic control devices on or near the construction equipment.

w.  Failing to properly monitor crash/incident records in the construction zone and/or update the traffic control zone accordingly.

72.  The Defendant's failure to adhere to and/or implement the basic guidelines governing roadway construction zones caused the Plaintiff's damages.

73.    Had the Defendant remedied even one of the above deficiencies, the Plaintiff's damages would have been completely avoided or, at the very least, greatly mitigated.

74.    For example:

a.    Had the Defendant placed a "road work" and/or an "advance warning" sign, the Plaintiff would have been alerted to the presence of the construction zone.

b.    Had the Defendant placed a barricade, barrels, or cones where the edge of Highway 90 met the edge of the service road, the Plaintiff would have been prevented and/or deterred from turning onto the service road.

c.    Had the Defendant placed the "road closed" sign on a Type 3 barricade in the center of the area where the edge of Highway 90 met the edge of the service road, the Plaintiff would have been alerted that this area was not Highway 90, and would not have mistakenly turned onto it.

d.    Had the Defendant placed a barricade, barrels, or cones at or across the center of the service road, the Plaintiff would have been prevented and/or deterred from driving onto the service road.

e.    Had the Defendant placed the "road closed" sign on a Type 3 barricade in the center of the service road, the Plaintiff would have been alerted that the road was closed, and would not have driven down the service road.

f.      Had the Defendant parked and/or stored the construction equipment to the side of the service road, rather than in the middle of the service road, the equipment would not have been in the path of the Plaintiff's vehicle.

g.      Had the Defendant placed barricades, drums, or cones in front of the equipment, the Plaintiff would have been alerted to the equipment's presence in the middle of the road.

h.      Had the Defendant placed a light on the equipment, the Plaintiff would have been alerted to the equipment's presence in the middle of the road.

i.      Had the Defendant placed crash cushions in front of the equipment, the Plaintiff's vehicle would have impacted the crash cushions, rather than the equipment.

75.    The Defendant's burden in implementing at least one of these means was significantly less than the probability of the loss. For instance:

a.      6 volt LED lights cost about $24.00 each.[106]

b.      Cones cost about $28.00 each.[107]

c.      Drums cost about $38.00 each.[108]

d.      Type D warning lights cost about $45.00 each.[109]

e.      "Road Work Ahead" signs cost about $54.00 each.[110]

---

[106] *See* https://www.trans-supply.com/pg/238/6-volt-led-light (last visited July 11, 2023).
[107] *See* https://www.trans-supply.com/pg/82/ring-looper-cone (last visited July 11, 2023).
[108] *See* https://www.trans-supply.com/pg/229/traffic-drums-eg-sheeting-w-bases (last visited July 11, 2023).
[109] *See* https://www.trans-supply.com/pg/11/type-d-warning-lights (last visited July 11, 2023).
[110] *See* https://www.trans-supply.com/pg/242/road-work-ahead (last visited July 11, 2023).

      f.      Type III plastic barricades cost about $143.00 (48" wide); $160.00 (72" wide); $176.00 (96" wide); $193.00 (120" wide); or $212.00 (144" wide) each.[111]

      g.      Crash cushions cost about $330.00 each.[112]

76.     Had the Defendant implemented at least one of the above mentioned measures, the Plaintiff's injuries could have been avoided entirely, or, at the very least, reduced in severity. The Defendant's failure to do so was a direct and proximate cause of the Plaintiff's injuries.

77.     By reason of the foregoing, the Plaintiff demands judgment against the Defendant for all actual and compensatory damages suffered, as well as for punitive damages in an amount sufficient to keep such wrongful conduct from being repeated, together with interest, if applicable, and all costs of this action and for such other and further relief as this Honorable Court and/or jury may deem just and proper.

<u>COUNT TWO</u>

78.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 76 as though fully set forth herein.

79.     The Defendant was working on a roadway construction project funded by Federal-aid.

---

[111] *See, e.g.,* https://www.trans-supply.com/pg/129/type-iii-plastic-barricades-48-wide; https://www.trans-supply.com/pg/52/type-iii-plastic-barricades-72-wide; https://www.trans-supply.com/pg/93/type-iii-plastic-barricades-96-wide; https://www.trans-supply.com/pg/212/type-iii-plastic-barricades-120-wide; https://www.trans-supply.com/pg/202/type-iii-plastic-barricades-144-wide (last visited July 11, 2023).

[112] *See* https://www.trans-supply.com/pg/296/34-x-70-polycade-barrier-tb-6?ProductID=7695&gclid=CjwKCAjw9pGjBhB-EiwAa5jl3D9Iir-iVCqN96pC1mRi6h3SltqEZ5DuPrqk6WE7k5cePlX0BkZx0xoCjzwQAvD_BwE (last visited July 11, 2023).

80.    Federal-aid roadway construction projects are subject to the provisions of 23 CFR 655. The MUTCD "is incorporated by reference into the Code of Federal Regulations at 23 CFR part 655."[113]

81.    23 CFR 655.603(d)(2) provides the following:

Federal-aid projects for the construction, reconstruction, resurfacing, restoration, or rehabilitation of streets and highways shall not be opened to the public for unrestricted use until all appropriate traffic control devices, either temporary or permanent, are installed and functioning properly. Both temporary and permanent devices shall conform to the MUTCD.

82.    23 CFR 655.603(d)(3) provides the following:

All traffic control devices installed in construction areas using Federal-aid funds shall conform to the MUTCD. Traffic control plans for handling traffic and pedestrians in construction zones and for protection of workers shall conform to the requirements of 23 CFR part 630, subpart J, Traffic Safety in Highway and Street Work Zones.

83.    The Defendant's contract for the Federal-aid project also included form FHWA-1273, which incorporated 23 CFR 635, and is applicable to all Federal-aid construction contracts and related subcontracts.

In the performance of this contract the contractor shall comply with all applicable Federal, State, and local laws governing safety, health, and sanitation (23 CFR Part 635). The contractor shall provide all safeguards, safety devices and protective equipment and take any other needed actions as it determines, or as the contracting officer may determine, to be reasonably necessary to protect the life and health of employees on the job and the safety of the public and to protect property in connection with the performance of the work covered by the contract.

23 CFR 635.108.

---

[113] *See* 23 CFR 630.1002, n.1.

84.     The Defendant's breach of its duties under the Code of Federal Regulations includes, but is not limited to, all of the failures listed in Count One.

85.     Had the Defendant implemented at least one of the above mentioned measures, the Plaintiff's injuries could have been avoided entirely, or, at the very least, reduced in severity. The Defendant's failure to do so was a direct and proximate cause of the Plaintiff's injuries.

86.     The following conduct further constitutes gross neglect and intentional disregard for the safety of human life. The development of the industry safety standards for erecting simple and low cost barriers for a road closing and for advance warning of the presence of obstructions in a construction zone are so thoroughly and readily documented that there is no possible way that the Defendant did not know of same when engaging in a state and federally funded road construction project. The Defendant's own public statements and its commitments in the award of this contract would likewise show that it had abundant knowledge of its obligation to follow these basic conditions, and its failure to do so was intentional and would support the imposition of punitive damages.

87.     By reason of the foregoing, the Plaintiff demands judgment against the Defendant for all actual and compensatory damages suffered, as well as for punitive damages in an amount sufficient to keep such wrongful conduct from being repeated, together with interest, if applicable, and all costs of this action and for such other and further relief as this Honorable Court and/or jury may deem just and proper.

## COUNT THREE

88.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 86 as though fully set forth herein.

89.     The Defendant's contract for its roadway construction project included the same or similar provisions to those contained within the Project Documents.

90.     Under the Project Documents, the Defendant had a duty to comply with the Traffic Control Plan and related provisions.

91.     The purpose of the Traffic Control Plan was to "maintain through and local traffic safely through construction zones," and its provisions were designed to provide for the safety of  drivers in and around the portion of the roadway under construction, such as the Plaintiff. The Defendant was tasked with taking "all necessary precautions for the protection of the work and the safety of the public." Therefore, Plaintiff is a third party beneficiary/the intended beneficiary of certain provisions in the Traffic Control Plan.

92.     The Defendant's breach of its duties under the Project Documents and Traffic Control Plan includes, but is not limited to, all of the failures listed in Count One and Count Two.

93.     Perhaps most egregiously, the Defendant breached its duty to comply with the Traffic Control Plan by failing to properly close the service road with a barricade. This was a clear and explicit duty that the Defendant owed to the traveling public, including the Plaintiff, an intended third-party beneficiary of the contract, as explained below:

a.    The Project Documents and MSSRBC mandated that the Defendant comply with the Traffic Control Plan.

b.    The Traffic Control Plan/MSSRBC required, among other things, that the Defendant (1) provide, construct, erect, maintain, clean, repair, and replace all necessary barricades; (2) protect any portion of the work closed to through traffic by effective barricades; and (3) implement barricades which met or exceeded the minimum requirements contained in the MUTCD.

c.    The MUTCD provides, among other things, that when a roadway is closed to all road users except contractors, the contractor should implement the following traffic control devices: (1) a "Road Closed" sign "installed at or near the center of the roadway on or above a Type 3 Barricade that closes the roadway."

94.    In addition, the Defendant breached its duty to comply with the Traffic Control Plan in the following ways:

a.    Failing to furnish, erect, maintain in good condition, and remove all required construction signs, barricades, and temporary traffic stripe.

b.    Failing to provide, erect and maintain all necessary barricades, lights, danger signals, signs and other traffic control devices.

c.    Failing to take all necessary precautions for the protection of the work and the safety of the public.

d.      Failing to maintain all traffic control features over the section of road under construction in accordance with Traffic Control Plan and/or MSSRBC.

e.      Failing to protect highways or parts of the work closed to through traffic with effective barricades.

f.      Failing to provide suitable warning signs to properly control and direct traffic.

g.      Failing to provide barricades, warning signs, lights, temporary signals, and/or other protective devices which met or exceeded the minimum requirements contained in the MUTCD.

h.      Failing to construct, erect, maintain, clean, repair and replace as necessary all barricades, warning signs and other traffic control devices specified or ordered.

i.      Improperly storing and/or parking construction equipment.

95.     In addition, the Defendant, either itself or through its self-appointed Traffic Control Supervisor, breached the duty to comply with the Traffic Control Plan in the following ways:

a.      Failing to ensure that all traffic control devices are in compliance with the plans, specifications and latest edition of the MUTCD.

b.      Failing to correct traffic control safety hazards immediately after discovery.

c.    Failing to monitor the work to ensure that no potential hazards exist due to the Contractor's operations.

96.    Had the Defendant implemented at least one of the above mentioned measures, the Plaintiff's injuries could have been avoided entirely, or, at the very least, reduced in severity. The Defendant's failure to do so was a direct and proximate cause of the Plaintiff's injuries.

97.    The Defendant intentionally breached this contract with advance knowledge of the potential harm that could be caused.

98.    By reason of the foregoing, the Plaintiff demands judgment against the Defendant for all actual and compensatory damages suffered, as well as for punitive damages in an amount sufficient to keep such wrongful conduct from being repeated, together with interest, if applicable, and all costs of this action and for such other and further relief as this Honorable Court and/or jury may deem just and proper.

## INJURIES & DAMAGES

99.    As a direct and proximate result of the Defendant's negligence, breach of contract, and wrongful conduct as set forth herein, the Plaintiff has suffered and will continue to suffer physical and emotional injuries and damages including past, present, and future physical and emotional pain and suffering as a result of the incident. The Plaintiff is entitled to recover damages from the Defendant for these injuries in an amount to be proven at trial.

100.    As a direct and proximate result of the Defendant's negligence, breach of contract, and wrongful conduct as set forth herein, the Plaintiff has incurred and

will continue to incur the loss of full enjoyment of life as a result of the incident. The Plaintiff is entitled to recover damages for loss of the full enjoyment of life from the Defendant in an amount to be proven at trial.

101.    As a direct and proximate cause of the Defendant's negligence, breach of contract, and wrongful conduct as set forth herein, the Plaintiff has incurred medical treatment expenses and will continue to incur expenses for medical care and treatment, as well as other expenses, including increased cost of daily living assistance and services, as a result of the injuries he suffered as a result of the incident. The Plaintiff is entitled to recover damages from the Defendant for his past, present, and future medical and other expenses in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff  demands judgment against the Defendant as follows:

A.    That Plaintiff has a trial by jury on all of the claims and issues;

B.    That judgment be entered in favor of Plaintiff and against Defendant on all of the aforementioned claims and issues;

C.    That Plaintiff recover all damages against Defendant, general damages and special damages, including economic and non-economic, to compensate Plaintiff for his injuries and suffering sustained because of Defendant's negligence.

D.    That Plaintiff be allowed to amend his complaint to include a claim for punitive damages against Defendant, according to proof;

E.    That all costs be taxed against Defendant

F.    That prejudgment interest be awarded to Plaintiff according to proof; and

G.    That this Court award Plaintiff any other relief that it may deem equitable and just, or that may be available under the law of another forum to the extent the law of another forum is applied, including but not limited to all relief prayed for in this Complaint and in the foregoing Prayer for Relief.

Respectfully submitted, this 26th day of July, 2023.

> JOHN GOMILLA
>
> BY: SCIALDONE LAW FIRM, PLLC
>
> */s/ John A. Scialdone*
> John A. Scialdone, MS Bar No. 9524
> John W. Weber III, MS Bar No. 101020
> SCIALDONE LAW FIRM, PLLC
> 1319 14th Street
> Gulfport, MS 39501
> P.O. Box 4080 (39502)
> Telephone: (228) 822-9340
> Facsimile: (228) 822-9343
> Email:  jscialdone@slfirmus.com
>           jweber@slfirmus.com
> *Attorneys for the Plaintiff*